**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DARBY ANESTHESIA ASSOCIATES, INC., | : | |
| | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO.  06-1565 |
| | : | |
| ANESTHESIA BUSINESS CONSULTANTS, LLC, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM AND ORDER

Tucker, J.                                                                              July  ___ , 2008

      Presently before this Court is Defendant's Motion for Partial Summary Judgment (Doc.

18).  Oral argument on Defendant's Motion was held before the Court on July 8, 2008.  For the

reasons set forth below, upon consideration of Defendant's Motion, Plaintiff's Response (Doc.

20), and Defendant's Reply (Doc. 21), this Court will grant Defendant's Motion.

## BACKGROUND

      From the evidence of record, taken in a light most favorable to the Plaintiff, the pertinent

facts are as follows.   This is a breach of contract action between Plaintiff, Darby Anesthesia

Associates (Plaintiff or "Darby") and Defendant Anesthesia Billing Company (Defendant or

"ABC") in connection with a written agreement executed by the parties for the collection of

revenue from anesthesia procedures performed by Plaintiff's physicians at Mercy-Fitzgerald

Hospital (hereinafter "the agreement").  In early 2003, Plaintiff, unsatisfied with its then current

billing company, went in search of a new medical procedures billing company.  Plaintiff solicited

recommendations and an officer from Mercy Fitzgerald Hospital recommended ABC.  Plaintiff

pursued this recommendation and contacted ABC.  ABC requested that Plaintiff provide it with

certain information so that ABC could analyze Plaintiff's needs.   In January 2003, Plaintiff

provided this information which included information about the number of procedures performed

annually by Darby, the payors with which Darby was enrolled, and procedures performed.

On February 24, 2003, Defendant's sales representative, Tom Jones, traveled to

Plaintiff's office to present to Plaintiff Defendant's professional medical billing services.

Plaintiff's agents, Kevin M. Campbell, M.D.; John Cataldo, CPA, Darby's accountant; and

Donna Barbetta, Darby's office manager, attended the sales meeting, where Mr. Jones provided

them with a written proposal and delivered an oral presentation.  Impressed by Defendant's sales

presentation and its claims that it could improve Plaintiff's annual revenue collection by fifty-two

percent, Dr. Campbell informed Mr. Jones that he made the decision to hire ABC, but needed

ABC to start immediately so that he could terminate the services of ABC's then current billing

company.  Mr. Jones responded by representing that  if Dr. Campbell signed an agreement

immediately, ABC could start immediately to handle old billing and would be ready to bill new

claims by March 15, 2003.  Mr. Jones directed Dr. Campbell to its standard billing and

management service contract at the back of its proposal.  Dr. Campbell skimmed the contract

before inquiring if there was anything he should read in particular.  Mr. Jones advised him that

the contract was ABC's standard form contract.  Dr. Campbell then signed the contract.

Under the agreement, Defendant was responsible for (1) processing the appropriate

insurance forms for payment; (2) balance billing patients when appropriate; (3) posting all

payments; (4) handling re-billing, adjustments and follow-up when necessary; and (5) providing

regular reports to Plaintiff describing charges, payment and contractual adjustments.  Defendant

was to use "due care" in performing its duties and "commercially reasonable efforts" to correct

any errors or omissions made during the course of performance.  Defendant's Motion at Exhibit A, Agreement ¶ 6.1.  Plaintiff was allotted ninety (90) days to report any failure of performance by Defendant.  Id.  Defendant's liability for monetary damages resulting from its errors or omissions was capped at three (3) times its monthly average fee, which the parties set at 5.5% of the amount collected by Defendant (hereinafter "the damages limitation provision").  Id. at ¶ 6.4.

After he signed the agreement, Dr. Campbell explained that Darby's primary concern was that it be provided with sufficient information to monitor ABC's performance.  Dr. Campbell requested that ABC provide Darby with periodic, comprehensive reports and access to ABC's computer systems, limited to Darby's patient account, to understand the steps and measures being taken by ABC with regard to getting payment for insurers for procedures performed by Darby anesthesiologists and billed by ABC.   Dr. Campbell also requested that ABC split the cost of the salary of Donna Barbetta, Plaintiff's Office Manager, who would be responsible for assisting with billing and collections activity.  Defendant agreed to these additional terms.

After the sales meeting and contract execution on February 24, 2003, Dr. Campbell sent a letter to Darby's then current billing company terminating its services.  ABC began conversion of the old accounts receivable the next day, February 25, 2003, and started billing new charges on March 15, 2003.   From February 2003 to October 2004, Plaintiff submitted in excess of 10,000 new claims to Defendant for Defendant, in turn, to submit to third-party payors for payment.

On March 27, 2006, Plaintiff filed suit against Defendant in the Court of Common Pleas of Delaware County, alleging that Defendant failed to re-bill or was slow in re-billing third-party payors and made errors in submitting new claims.  Plaintiff also alleges that Defendant failed to bill for a large number of surgical procedures performed by a certain Darby physician.

Accordingly, Plaintiff claims that Defendant breached the agreement, causing Plaintiff substantial economic damages.[1]  Defendant removed the action to federal district court on the basis of diversity of citizenship.  Defendant now moves for partial summary judgment, arguing that the damages limitation provision caps Defendant's potential liability at three (3) times the average monthly fee paid by Plaintiff to ABC, or approximately $25,340.00.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis of its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the movant's initial Celotex burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, "the adverse party's response, by affidavits or otherwise as provided in this rule, must set forth specific facts showing that there is

---

[1] Plaintiff estimates its actual damages at almost $300,000.00.  See Report of Plaintiff's expert, Patricia Murphy, Plaintiff's Response at Exhibit G.

a genuine issue for trial." Fed. R. Civ. P. 56(e).  That is, summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322.  "[I]f the opponent [of summary judgment] has exceeded the 'mere scintilla' [of evidence] threshold and has offered a genuine issue of material fact, then the court cannot credit the movant's version of events against opponent, even if the quality of the movant's evidence far outweighs that of its opponent." <u>Big Apple BMW, Inc. v. BMW of N. Am., Inc.</u>, 974 F.2d 1358, 1363 (3d Cir. 1992).  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  <u>Anderson</u>, 477 U.S. at 255.

## DISCUSSION

Defendant argues that it is entitled to partial summary judgment because the damages limitation provision limits Plaintiff's recover to three (3) times ABC's average monthly fee, or approximately $25,340.00.   Plaintiff maintains that the damages limitation provision is unconscionable, or in the alternative, the agreement should be read to require commercially reasonable efforts by Defendant in correcting its errors and omissions before the agreement's damages limitation provision can be said to apply.   The Court finds that damages limitation provision is neither unconscionable nor has any condition precedent to its application. As such, the Court will grant Defendant's Motion for Partial Summary Judgment.   Having found that Plaintiff's recovery is limited to three (3) times Defendant's average monthly fee, or approximately $25,340.00, the Court will remand the instant action to the Court of Common of Pleas for failure to meet the jurisdictional amount in controversy under 28 U.S.C. § 1332.

1.      **Unconscionability**

As an initial matter, the agreement between the parties is governed by Michigan law.  See

Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 497 (1981) (stating that a federal court

sitting in diversity must apply the choice of law rules of the forum state); Echols v. Pelullo, 377

F.3d 272, 275 (3d Cir. 2004) (under Pennsylvania law, contractual choice of law provisions

generally are enforced); Defendant's Motion at Exhibit A ¶ 8.4 ("This Agreement will be

governed by, and construed in accordance with, the laws of the State of Michigan ….").  Under

Michigan law, parties are free to enter into any contract at will provided the contract is not

contrary to Michigan law and does not conflict with public policy.  WXON-TV, Inc. v. A.C.

Nielsen Co., 740 F. Supp. 1261, 1265 (E.D. Mich. 1990); Curran v. Williams, 89 N.W.2d 602,

604-05 (Mich. 1958).  Michigan law permits a party to a contract to limit its liability in the event

of a breach.  WXON-TV, 740 F. Supp. at 1264; Curran, 89 N.W.2d at 604-06  While Michigan

courts generally apply the principle of just compensation, where damages are difficult or

impossible to ascertain at the time of contract formation and "the parties themselves are more

intimately acquainted with all the peculiar circumstances, and therefore better able to compare

the actual or probable damages, than courts or juries," the law allows the parties to set forth the

amount of damages which shall be paid in the event of a breach.  Curran, 89 N.W.2d at 606.

Limitations of liability will be upheld unless they are deemed unconscionable. WXON-TV, 740

F. Supp. at 1264.   "Unconscionability will rarely be found in a commercial contract." Id.

Unconscionability is a question of law for the court, and is determined based on the facts

as they existed at the time of the contract's formation, rather than at the time of suit.  Citizens

Ins. Co. v. Proctor & Schwartz, 802 F. Supp. 133, 143 (W.D. Mich. 1992) (citing Northwest

Acceptance Corp. v. Almont Gravel, Inc., 412 N.W.2d 719, 722 (Mich. App. Ct. 1987)).  To determine whether a provision is unconscionable, courts apply a two prong test, examining the provision for procedural and substantive unconscionability: "(1) what is the relative bargaining power of their parties, their relative economic strength, the alternative sources of supply, in a word, what are their options? [and] (2) Is the challenged term substantively unreasonable?" WXON-TV, 740 F. Supp. at 1264 (quoting Allen v. Mich. Bell Telephone Co., 171 N.W.2d 689, 692 (Mich. App. Ct. 1969)).  The first prong, the procedural unconscionablity inquiry, examines the circumstances under which the contract was made and the relative bargaining power of the parties.  Id.  The second prong, the substantive unconscionability inquiry, looks directly at the contractual provision itself to determine whether it is commercially reasonable.  Id. (citing Johnson v. Mobil Oil Corp., 415 F. Supp. 264, 268 (E.D. Mich. 1976)).  For a contractual provision to be deemed unconscionable, the party seeking invalidation must demonstrate that the provision is both procedurally and substantively unconscionable; both elements must be present for invalidation.  Id. (citing Allen, 171 N.W.2d at 692); Citizens, 802 F. Supp. 2d at 144.

A.     **Procedural Unconscionability**

The damages limitation provision is not procedurally unconscionable.  Factors for determining procedural unconscionability include: the parties' "business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the [services] in question." Citizens Ins. Co. v. Proctor & Schwartz, 802 F. Supp. 133, 143 (W.D. Mich. 1992); accord WXON-TV, 740 F. Supp. at 1264. Plaintiff and Defendant are both sophisticated and experienced business entities of comparable

7

bargaining power.  At the time of contract formation, other options were available to Plaintiff as

Plaintiff had a choice between three (3) billing companies, including ABC.  After embarking on a

several-month long selection process, Plaintiff ultimately selected Defendant based on its sales

proposal.  Defendant drafted the agreement, which was its standard form contract and which it

attached to the end of its proposal.  Plaintiff's agent, Dr. Campbell, skimmed the contract before

signing the agreement.

  Plaintiff argues that Defendant's standard form contract was a contract of adhesion,

thereby making its provisions, including the damages limitation provision, unconscionable.

Under Michigan law, contracts of adhesion are procedurally unconscionable; however, "[t]he

mere fact that a contract is standardized and preprinted does not make it unenforceable as a

contract of adhesion."  St. Paul Fire & Marine Ins. Co. v. Guardian Alarm Co., 320 N.W.2d 244,

247 (Mich. App. Ct. 1982).  Instead, a contract of adhesion is an agreement entered into by the

non-drafting party due to a lack of meaningful choice as to its acceptance:

> Where a contract is prepared by one party and offered for rejection or acceptance
> without opportunity for bargaining under circumstances in which the party cannot
> obtain the desired product or service except by acquiescing in the form agreement,
> Michigan courts will conclude that the contract is adhesive and therefore
> procedurally unconscionable.

Lozada v. Dale Baker Oldsmobile, Inc., 91 F. Supp. 2d 1087, 1100 (W.D. Mich. 2000).

  Plaintiff contends that the agreement was presented under circumstances which evidence

adhesion.  Plaintiff was in need of a new billing company which could start immediately.  Dr.

Campbell skimmed Defendant's standard form contract while he was "engaged in and distracted

by a sales presentation meeting." Plaintiff's Response at 17-18.  Although Dr. Campbell inquired

if there was anything he should read in particular, Defendant's agent, Mr. Jones, did not alert him

to the damages limitation provision, which appeared in small font on the second page of the standard form contract.  Dr. Campbell, signed the contract after Defendant advised that it could begin providing services as soon as he signed the agreement.

None of these facts, however, evidence adhesion.  As stated above, Plaintiff had a choice between three (3) billing companies and selected ABC after engaging in a several-month long selection process.  The standard form contract was presented to Plaintiff during Defendant's sales presentation but Plaintiff was not required to sign the document at the meeting.  While Defendant advised that it could begin performance immediately after Plaintiff signed the contract, it was Plaintiff's choice to sign the contract at the meeting, rather than to first carefully review the contract's provisions.  Plaintiff's failure to carefully review the contract during the sales meeting (or thereafter) was not the result of any action on the part of Defendant, but due to Plaintiff's apparent enthusiasm with Defendant's proposal. See Clark v. Daimler-Chrsyler Corp., 706 N.W.2d 471, 475 (Mich. App. Ct. 2005) (stating that "one who signs an agreement, in the absence of coercion, mistake, or fraud, is presumed to know the nature of the document and to understand its contents, even if he or she has not read the agreement").  Further, there is no evidence that Plaintiff was unable to make changes to the standard form contract as Plaintiff insisted on terms that were not included in the contract but to which Defendant nonetheless agreed.  For example, Defendant agreed to allow Plaintiff access to its computer system and to share the cost of the salary of Donna Barbetta, Plaintiff's office manager, who would assist with billing and collections activity.  On these facts, there is no evidence to support a finding of procedural unconscionability; Plaintiff, a party with comparable bargaining power, had a meaningful choice as to acceptance of the agreement's terms.  See Clark, 706 N.W.2d at 474 ("If,

under a fair appraisal of the circumstances, the [non-drafting] party was free to accept or reject the term, there was no procedural unconscionability."); <u>Allen</u>, 171 N.W.2d at 637-38.

### B.    Substantive Unconscionability

The damages limitation provision is not substantively unconscionable.  To be deemed substantively unconscionable, a contractual provision must be substantively unreasonable. <u>WXON-TV</u>, 740 F. Supp. at 1264.  A provision is not substantively unreasonable merely "because it is foolish for one party and very advantageous to the other[;]" rather, "a term is substantively unreasonable where the inequity of the term is so extreme as to shock the conscience."  <u>Clark</u>, 706 N.W.2d at 475 (citing <u>Gillam v Michigan Mortgage-Investment Corp</u>, 194 N.W. 981, 982 (Mich. 1923)); <u>accord</u> <u>WXON-TV</u>, 740 F. Supp. at 1264 (stating that a court may not invalidate a contract merely because it believes that a party entered into an "unwise agreement").  Such inequity is determined by the "commercial setting, purpose, and effect of the provision."  <u>Reed v. Kaydon Engineering Corp.</u>, 706 N.W.2d 487, 489 (Mich. App. Ct. 2005) (citing <u>Williams v. Walker-Thomas Furniture Co.</u>, 350 F.2d 445, 449 (D.C. Cir. 1965)).

Plaintiff argues that by limiting Defendant's liability to three (3) times its monthly average fee, the damages limitation provision fails of its essential purpose, by rendering illusory Defendant's promise to perform with "due care" and to make corrections in a "commercially reasonable" manner.  <u>See</u> Defendant's Motion at Ex. A, Agreement at ¶ 6.1 (stating that ABC will use "commercially reasonable efforts" to correct errors or omissions).  Plaintiff's reliance on the failure-of-the-essential-purpose doctrine is misplaced because the doctrine is grounded in the Uniform Commercial Code (UCC) and its associated case law and thus, applicable only to contracts for the sale of goods.  <u>See</u> <u>Pichey v. Ameritech Interactive Media Services, Inc.</u>, 421 F.

Supp. 2d 1038, 1045 (W.D. Mich. 2006) (rejecting extension of the doctrine to services contracts and noting that "the doctrine of unconscionability more properly provides the vehicle for determining whether the terms of a services contract are sufficiently one-sided as to undermine the purpose of the agreement"); Defendant's Reply at 6 (noting that under Michigan law, limitation of damages provisions in contracts for the sale of goods are statutorily unconscionable) (citing MICH. COMP. LAWS § 440.2719(2)).  Even if the Court were to deem extension of the failure-of-the-essential-purpose doctrine proper under Michigan law (which it does not), Plaintiff's argument ignores the parties' agreement that Defendant's monthly fee was to be 5.5% of the revenue collected—that is, the payments to made to Defendant were directly tied to its performance.  Thus, Defendant logically had incentive to perform under the agreement.

Next, Plaintiff argues that the purpose of a limitations provision is to pre-determine an amount representative of just compensation for a breach where damages are difficult to calculate, and that in this case, calculation of actual damages is time-consuming but not difficult.  Further, Plaintiff further argues that Defendant could have calculated potential damages based the information Plaintiff provided to Defendant, prior to contract formation, regarding Plaintiff's charges for anesthesia, the payors with whom Plaintiff's physicians were enrolled and the number of pain procedures performed annually.  Under Michigan law, a prerequisite for enforceability of a damages limitation provision is that the potential damages were impossible or difficult to ascertain at the time of contract formation.  Curran, 89 N.W.2d at 606.  Although Plaintiff arguably provided Defendant with sufficient information from which Defendant could have set a more equitable damages limitation provision, calculation of potential damages at the time of contract formation would still have been difficult, and more importantly, Defendant had

11

no obligation to set the limitation at an amount favorable to Plaintiff.  <u>See</u> Plaintiff's Response at 16 (acknowledging that calculation of actual damages at nearly $300,000.00 was a time-consuming endeavor for its billing expert); <u>see also</u> <u>Clark</u>, 706 N.W.2d at 475 (stating that substantive unconscionablity requires more than a showing that the provisions was beneficial for one party and unwise for the other) (citing <u>Gillam</u>, 194 N.W. at 982).

That Defendant set the limitation at three (3) times its average monthly fee, or approximately $25,340.00, is not so grossly inequitable as to shock the conscience.  This finding is buttressed by the agreement's allocation of the risk of deficient performance.  Under the agreement, Defendant received a limited monthly fee, 5.5% of the revenue collected, in exchange for limited liability exposure, the average of three (3) months of its fees.  The agreement also provided that Darby should report any failure of performance within ninety (90) days, the same time period used in the limitation of damages provision.  While the limitations of damages provision could be characterized as unfair because it limits Plaintiff's potential recovery to approximately $25,340.00 where its actual damages are closer to $300,000.00, the provision cannot be said to shock the conscience due to gross inequity.[2]  <u>Cf.</u> <u>St. Paul Fire</u>, 320 N.W.2d at 247 (upholding damages limitation to the aggregate of six monthly payments or $250.00, whichever was less, despite significant disparity in the relative bargaining power of the parties).

**2.    Contract Interpretation**

Despite Plaintiff's assertions, ¶¶ 6.1 and 6.4 of the agreement do not read together to

---

[2] Even assuming <u>arguendo</u> that the damages limitation provision were to be deemed so grossly inequitable as to shock the conscience, a finding of substantive unreasonableness is insufficient to invalidate the provision. Under Michigan law, unconscionability requires a showing of both procedural and substantive unconscionality for invalidation.  <u>WXON-TV</u>, 740 F. Supp. at 1264 (citing <u>Allen</u>, 171 N.W.2d at 692); <u>Citizens</u>, 802 F. Supp. 2d at 144.

provide a condition precedent of due care and commercially reasonable efforts at correction to

application of ¶ 6.4's damages limitation provision.  In pertinent part, ¶ 6.1 provides:

> ABC will use due care in processing all work submitted to it by Customer and
> agrees to correct, at its expense, any errors that are due solely to the malfunction
> of ABCs computer, operating systems or programs, or errors by ABC's .
> Correction will be limited to re-running the job or jobs and/or recreating data or
> program files. ... Should there be any failure in performance or errors or omissions
> with respect to the Services [provided by ABC,] ABC's liability will be limited to
> using commercially reasonable efforts to correct such failure in performance or
> errors or commissions, and in no event, except as specifically set forth herein, will
> ABC be liable to Customer or any third parties (including without limitation
> Customer's clients) for any claim, loss or damage, ordinary, special or
> consequential or otherwise, even if ABC has been advised of the possibility of
> such damage. THIS WARRANTY IS EXCLUSIVE AND IN LIEU OF ALL
> OTHER WARRANTIES, AND CUSTOMER HEREBY WAIVES ALL OTHER
> WARRANTIES, EXPRESS, IMPLIED OR STATUTORY INCLUDING BUT
> NOT LIMITED TO ANY WARRANTY OF MERCHANTABILITY,
> INFORMATION OR FITNESS FOR USE FOR A PARTICULAR PURPOSE.

Defendant's Motion at Ex. A, Agreement ¶ 6.1.  Paragraph 6.4 provides in relevant part:

> ABC's liability in any and all categories and for any all causes arising out of this
> Agreement will, in the aggregate, not exceed three (3) times the average sum paid
> by Customer to ABC per month pursuant to this Agreement taken over the twelve
> (12) months preceding the month in which the damage or injury is alleged to have
> occurred ….

Defendant's Motion at Ex. A, Agreement ¶ 6.4.  While contracts generally are construed against

the drafter, Schroeder v. Terra Energy, 565 N.W.2d 887, 892 ( Mich App Ct. 1997), the language

contained in these provisions plainly does not create a condition precedent prior to applicability

of the damages limitation provision.  Instead, read together, these two provisions simply state

that Defendant shall use due care in providing its billing services and commercially reasonable

efforts to correct mistakes made during performance, and in the event of damages resulting from

failed performance, damages will be capped at three (3) times Defendant's average monthly fee.

3.       **Remand to State Court**

The instant action will be remanded to state court for failure to meet the jurisdictional amount in controversy.  Title 28, section 1332 vests in the district courts jurisdiction over civil actions between citizens of different states where the amount in controversy exceeds $75,000.00, exclusive of interest and costs.  28 U.S.C. § 1332(a)(1).  Where a federal court's jurisdiction is premised on diversity of citizenship, "the sum claimed by the plaintiff controls if the claim is apparently made in good faith."  Frederico v. Home Depot, 507 F.3d 188, 194 (3d Cir. 2007) (quoting St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 288 (1938)).  The plaintiff's case may be dismissed, however, if "from the face of the pleadings, it is apparent, to a legal certainty, that the plaintiff cannot recover the amount claimed, or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount."  Id. (quoting Red Cab Co., 303 U.S. at 289).  Because the damage limitations provision caps Plaintiff's recovery at approximately $25,340.00, the amount in controversy requirement is not met, and thus the Court does not have jurisdiction over the instant action.  See id. at (stating that "[w]hen it appears to a legal certainty that the plaintiff was never entitled to recover the jurisdictional amount, the case must be dismissed"); accord Valley v. State Farm Fire & Cas. Co., 504 F. Supp. 2d 1, 4 (E.D. Pa. 2006) (stating that a case must be dismissed or remanded if it appears to a legal certainty that the plaintiff cannot recover more than the jurisdictional amount).

## CONCLUSION

For the foregoing reasons, this Court will grant Defendants' Motion for Partial Summary Judgment.  The Court will also remand the instant action to the Court of Common Pleas for failure to satisfy the jurisdictional amount in controversy.   An appropriate order follows.

14